CHRYSLER CORPORATION, A DELAWARE CORPORATION, APPELLEE,
v. LEE JANSSEN MOTOR COMPANY,
A NEBRASKA CORPORATION, APPELLANT.

619 N.W. 2d 78

Filed October 31, 2000.    No. A-99-1082.

Gary J. Nedved, of Keating, O'Gara, Davis & Nedved, P.C., for appellant.

Robert D. Kinsey, Jr., and Richard L. Rice, of Kinsey, Ridenour, Becker & Kistler; and Mark F. Kennedy and Christopher J. Meyer, of Wheeler, Trigg & Kennedy, P.C., for appellee.

HANNON, INBODY, and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

This is an appeal from the district court for Lancaster County reversing the denial by the Nebraska Motor Vehicle Industry Licensing Board (Board) of an application of Chrysler Corporation (Chrysler) to terminate the franchise of Lee Janssen Motor Company (Janssen). The district court held that Chrysler had shown "good cause" to and could terminate Janssen's franchise under Neb. Rev. Stat. § 60-1433 (Reissue 1998). For the reasons stated below, we affirm.

## BACKGROUND

Lee Janssen (Lee) purchased an automotive dealership in McCook, Nebraska, in 1971 and subsequently signed agreements with Chrysler, licensing Janssen as a motor vehicle dealer for the Chrysler, Plymouth, and Dodge line-makes. The franchise agreements required Janssen to perform warranty service on all Chrysler family vehicles. Janssen received immediate payment from Chrysler for warranty work performed by submitting warranty reimbursement information electronically via the "Dealer Information Access Link (DIAL)," an electronic system through which a franchised dealer and Chrysler communicate. Chrysler relied on Janssen to submit accurate information via DIAL. Janssen was also required to (1) keep books and records relating to warranty service and parts and (2) allow Chrysler the opportunity to inspect these books and records. If an audit resulted in the disallowance of warranty claims previously submitted by Janssen, Chrysler had the right to charge back Janssen for money paid on ineligible claims.

With respect to customer rebates or sales incentives, Chrysler rules required that the specific vehicle model be sold to a retail customer, not a wholesale, fleet, or business purchaser, and that the sale occur within a set program period. The rules also expressly excluded sales to daily rental companies and brokered sales. Chrysler rules defined "broker" as an

> individual or company . . . who acts as an intermediary between a franchised dealer and a retail customer for the purpose of selling/leasing vehicles. It will be presumed that any vehicle resold, or leased, in another name during the first twelve (12) months after initial sale, was purchased for the purpose of a brokered sale or lease resale.

Under each set of customer rebate program rules, Chrysler reserved the right, and the dealer agreed, to subsequent audits. The dealer was required to retain supporting documentation for 2 years and agreed that Chrysler could charge back the dealer for ineligible claims that were paid. If a dealer submitted a false or fraudulent claim with respect to either sales incentives or warranty repairs, the franchise could be terminated.

The origins of Janssen and Chrysler's dispute date back at least to 1982 when, following an audit, Chrysler charged back Janssen for, among other things, sales incentives claimed on sales to Lee's wife, Patricia Janssen (Patricia), for vehicles used in Janssen's Avis rental car operation, although Janssen asserted that the 1982 charge backs were for a different problem. At that time, Chrysler warned Janssen not to make such claims.

In 1990, after conducting a routine analysis of dealer warranty expenses, Chrysler determined that Janssen's expenses were not in line with the national average. An audit was conducted by a Chrysler auditor, Greg Grimes, in the spring of 1990, covering records from 1988 to 1990, or approximately a 3-year period. The 1990 warranty audit resulted in 271 separate warranty charge backs for, among other things, document alterations to the mileage, service date, or VIN, making it appear to Chrysler that the vehicles were eligible for warranty service. Grimes also found six vehicles reported as being sold to Patricia for which Janssen had claimed retail customer sales incentives, which vehicles were purportedly used in Janssen's Avis rental car operation. Following the final audit meeting on June 15,

1990, Chrysler reduced the original charge back by some $4,000 to a final amount of $17,279 worth of warranty-related charge backs to Janssen, but did not assess charge backs for sales incentives at that time. Shortly after the audit, Janssen received a letter from Grimes' supervisor, informing Janssen that no sales incentive irregularities had been found. Subsequently, Janssen filed a claim against Chrysler before the Board concerning the various warranty charge backs, which does not bear directly on the present case. See *Chrysler Corp. v. Lee Janssen Motor Co.*, 248 Neb. 281, 534 N.W.2d 568 (1995).

On August 28, 1990, the Board sent an investigator, Julie Barkley, to look into Janssen's operations, after receiving a written request for investigation from the Red Willow County treasurer, questioning Janssen's practice of claiming sales tax exempt status on eight vehicles sold in 12 months to Patricia. Barkley's report to the Board stated that Lee indicated he had reported the vehicles as retail sales to Patricia in order to collect retail customer rebates from Chrysler, had placed the vehicles into Janssen's Avis rental car operation, would eventually sell the vehicles to retail buyers, and did not pay sales tax on the vehicles. Barkley's report further indicated that she advised Lee to discontinue the practice until additional information could be obtained from the affected agencies and individuals. Barkley contacted Chrysler regarding the situation and forwarded a copy of her report for Chrysler's review.

Based on the information uncovered by Grimes during the 1990 audit and Barkley's report, Chrysler sent Grimes back in 1991 to review Janssen's customer rebate submissions, including sales to Patricia. The 1991 customer rebate audit revealed that Janssen had reported 11 separate new vehicle sales to Patricia in 24 months, receiving customer rebates from Chrysler on all 11 sales. Grimes reported that while Lee admitted that the vehicles were really used in Janssen's Avis rental car operation, Lee was unable to produce documents showing that the vehicles had ever been rented. Janssen carried the vehicles on the corporate books as rental vehicles for income tax purposes. Subsequent to the 1991 audit, Chrysler charged back the sales incentives claimed with respect to all 11 vehicles.

On January 12, 1993, Chrysler served Janssen with a termination of the franchise notice. Following receipt of the termination letter, Lee met with Chrysler representatives in Detroit in May 1994 and requested that a second auditor be sent to the dealership for additional documentation that would allegedly refute the findings of the sales incentive audit. Chrysler sent an audit specialist, David Reinherz, to conduct another audit at the dealership in June 1994. Reinherz' audit report indicates that records were next to nonexistent, that journals and general ledgers were not available, and that Janssen refused to allow Reinherz to review certain documents. Reinherz' report indicates that all requests for new information were met with resistance.

On January 23, 1996, Chrysler filed an application with the Board to terminate Janssen's franchise pursuant to Neb. Rev. Stat. § 60-1424 (Reissue 1993).

Subsequently, in April or May 1996, Chrysler sent an auditor, Tony Schroeder, to audit Janssen's sales incentive program as well as its warranty documentation. The 1996 customer rebate audit revealed that 16 vehicles were sold to Patricia over the previous 24 months, that no sales tax was paid on these sales, that the vehicles were used in Janssen's Avis rental car operation, and that Janssen collected rebate money from Chrysler by claiming them all as retail sales. Chrysler also considered approximately one-half of these vehicles ineligible brokered sales, because the vehicles were resold by Patricia within a 12-month period. Repair records examined during the audit revealed references to " 'Avis' " for work done on the vehicles. As a result of this audit, Chrysler charged back the sales incentives on these 16 vehicles due to customer ineligibility.

The 1996 audit resulted in only a small percentage of warranty-related charge backs, with no charge backs for document alterations, although Schroeder was specifically looking for such evidence. However, there were five categories of charge backs in the warranty portion of the 1996 audit that were also present in the 1990 audit.

Chrysler's application to terminate Janssen's franchise was heard by the Board on June 18 and 19, 1997. The Board received evidence adduced from both parties on the issue of good cause.

Lee testified that he had successfully expanded the business since its purchase, had invested a total of approximately $900,000, and hoped to turn the business over to two of his sons. The evidence further indicated that Janssen employed approximately 19 employees. Lee testified that Janssen had invested $11,000 in the 8 months prior to the Board hearing in employee training costs. The evidence also indicated that Janssen had adequate motor vehicle facilities, equipment, parts, and qualified service personnel to satisfy Chrysler's customers and that it had honored Chrysler's warranties.

Joe Hannan, Chrysler's district manager, testified that if the Board permitted Chrysler to terminate Janssen's franchise, Chrysler was prepared to contract with another franchise for McCook, that McCook would not be a difficult location in which to establish another dealership, and that upon termination of the franchise, Chrysler was ready to comply with the repurchase requirements of Neb. Rev. Stat. § 60-1430.02 (Reissue 1993). Chrysler's auditors, Grimes, Schroeder, and Reinherz, all testified regarding the results of the audits in 1990, 1991, 1994, and 1996.

Joni Petersen, Chrysler's district manager during the 1990 audit period, testified that Chrysler does have a procedure for making "goodwill" exceptions for out-of-warranty repairs on a case-by-case basis, provided the dealership can supply documentation or explain why the repair should be covered. Petersen testified that Janssen used this procedure regularly and received many goodwill adjustments. She testified that she expressly instructed Janssen employees not to alter documents and that if a change was ever needed on a document, they were to void the first document and start over.

In Lee's testimony, he admitted that Janssen personnel altered a number of warranty documents over the approximately 3-year period reviewed during the 1990 warranty audit. Lee testified that he did not personally alter documents, did not authorize employees to do so, was not aware of the alterations until they were revealed through the audit process, and instructed employees to cease the practice following the 1990 audit. Lee further testified that he did not recall conversations with Petersen regarding voiding documents with errors or mistakes.

Janssen submitted customer testimony and various customer letters solicited by the dealership purporting to support the legitimacy of the disputed warranty claims. The signed customer letters were undated and typed on Janssen letterhead, and neither Lee nor Janssen personnel were able to verify in their testimony who actually drafted the letters. Interestingly, many of the letters reflected that the customer drove an exactly round number of miles between the time he or she noticed the problem and the time the vehicle was brought in for repair. Lee testified that during the 1990 audit, Grimes refused to contact customers to verify the claims.

With regard to the audit process, Grimes testified that the primary focus of the auditors was to determine what documentation existed to support a warranty or sales incentive claim and that any time they found a misrepresentation or an alteration to a document, they were to take exception to it. Grimes further testified that mileage for warranty claims was to be reported at the time of the repair, not when the customer first noticed the problem. Grimes disagreed with a question on cross-examination which implied that the dealership would not profit from the warranty document alterations, stating that on each repair order, the dealership does make a profit.

Evidence presented to the Board indicated that all changes to the warranty documents were made either by Harold McNutt or Gail Whitaker, Janssen's service manager and warranty clerk, respectively, during the relevant time period. McNutt testified that he wrote the customer repair orders and made most of the alterations on the warranty-related files that Chrysler brought before the Board. He indicated that some mileage changes may have been made, because he spoke to a customer a week before the customer was able to bring a vehicle into the shop for repair, or, if parts were not immediately available, he might have recorded the mileage first reported by the customer. McNutt also testified that when most of the repair was covered by warranty, but a small portion was not covered, he may have revised a customer repair order to reflect mileage within the warranty. McNutt indicated that he felt that Chrysler would have approved any requested authorizations and that he did not feel that he was defrauding Chrysler.

Whitaker was Janssen's part-time warranty clerk during the 1990 audit period. Her duties included receiving repair orders from the service manager, processing warranties, receiving authorization for repairs, and inputting data into the DIAL system. Because Janssen's warranty records were "a mess," Whitaker worked full time during the audit, along with another person that Janssen allegedly hired, to put the records in order and have them bound for the auditor. Whitaker testified that Janssen's recordkeeping improved after the 1990 audit due to correct filing and other methods learned from Grimes concerning how to correctly complete warranty claim documents. Whitaker testified that she did not recall making any of the "cross-out" alterations on customer repair orders received from the shop floor and knew that Petersen would give approval with respect to certain claims. Whitaker felt that the dealership would have benefited if the customer had paid instead of Chrysler, because the dealership receives a full markup on parts and full labor rate when the work is billed to the customer. She testified that she never felt that she acted in a way to cheat or defraud Chrysler.

With regard to the sales incentive portion of the audits, Lee testified that the vehicles sold to Patricia were occasionally rented out through the dealership, but used primarily for family purposes. Lee testified that the Janssen family had six members that were of driving age during the 1990 audit period. Family members also testified before the Board that these vehicles were used for family purposes. Lee testified that Janssen has had an Avis rental car operation since the early or mid-1970's, but does not have a "fleet" of rental cars in stock given the limited demand in McCook, and that Patricia has nothing to do with the Avis rental car operation. Lee testified that Janssen rents out a car two to four times per week, mostly to customers bringing in vehicles for service.

At the time of the sales to Patricia, Lee knew that cars sold to "daily rental customers" did not qualify for incentives. Since the term is not defined in Chrysler literature, Lee interpreted it to mean sales of vehicles that were going to be used exclusively for daily rental purposes. He did not believe that his infrequent rental operation was a "daily rental company." Lee also under-

stood that vehicles sold to family for school and work purposes qualified for the Chrysler incentives. The evidence indicated that Patricia's vehicles were financed, that Janssen made the monthly payments, and that Janssen claimed the Nebraska sales tax exemption on the vehicles as " '[p]urchased by a lessor.' " Lee testified that Patricia owned most of the vehicles for more than 1 year, after which time, she sold them back to Janssen, which then resold the vehicles to a different retail customer.

Lee stated that he disclosed his actions regarding the sales incentives to Chrysler during the 1990 audit. At the end of the audit, Grimes indicated to Lee that he did not know if he would charge back the incentives on the vehicles sold to Patricia. Grimes testified that he contacted his manager regarding this unusual audit finding and was advised to take no action at that time. Grimes further testified that during the 1991 audit, Lee definitely told him that the vehicles sold to Patricia were used in the Avis rental car operation and that Patricia used them personally on rare occasions. Janssen was unable to provide Grimes with rental records. Grimes testified that Lee told him Patricia qualified for a tax exemption for leasing and renting vehicles in the State of Nebraska, in other words, she was "Patricia Janssen, d/b/a Avis Rent-A-Car." Grimes testified that while the Chrysler rules may not specifically address vehicles sold to a family member and used for multiple purposes, that is, partly for rental and partly for family purposes, if a vehicle is used at all for rental purposes, it is considered a rental vehicle under the Chrysler guidelines. Grimes testified that the percentage of rental use was not relevant.

With regard to Barkley's investigation, Lee testified that he revealed his sales incentive activities and was left with the understanding that if he was doing anything wrong, someone from the State would be in touch with him. Lee testified that as he heard no further word after Barkley's investigation, he felt justified in continuing to claim Chrysler incentives on sales to Patricia while also using the vehicles occasionally as rentals. Finally, Lee testified that he retained counsel to advise him after receiving Chrysler's notice of termination in 1993, and based on counsel's opinion that Chrysler's rules did not cover a situation dealing with multipurpose vehicles and the fact that he did not

feel Janssen was doing anything wrong, Janssen continued to claim sales incentives on sales to Patricia.

On October 23, 1997, subsequent to the hearing, the Board issued an order finding that Chrysler had not shown good cause for termination of Janssen's franchise, as the alleged violations did not rise to a level sufficient to establish fraud. The order indicated that the Board had considered the evidence of good cause as it related to the statutory factors under § 60-1433. The Board's findings reflected favorably on Janssen with respect to the first six factors of § 60-1433. With respect to factors (7) and (8), the Board found that Chrysler's witness, Schroeder, testified that he found no evidence of any fraud or intentional wrongdoing in the warranty portion of the 1996 audit. The Board also found that the warranty document alterations did not rise to the level of fraud and that mistakes could be made without anyone doing something false or fraudulent. With respect to the sales incentives claimed on the sales to Patricia, the Board found that Chrysler's rules did not cover a multipurpose vehicle used partially for rental and partially for family use. The Board further found that sales to Patricia were not brokered motor vehicles, that there could be more than one interpretation of Chrysler's sales incentive rules, and that Janssen did nothing fraudulent by not following Chrysler's interpretation. The Board concluded by determining that Chrysler had not established statutory good cause for termination of Janssen's franchise and dismissing Chrysler's application.

Chrysler appealed to the district court on November 20, 1997. Subsequent to a hearing on March 26, 1999, in its order filed August 4, 1999, the district court found that by submitting false and altered warranty claims in order to receive payments from Chrysler and by repeatedly obtaining customer rebate money from Chrysler for vehicles Janssen knew were ineligible, Janssen had refused and continued to refuse to deal with Chrysler in good faith and had materially breached its franchise agreement. In evaluating the statutory good cause factors, the district court noted that the considerations set forth in § 60-1433 are expressly nonexhaustive and are not afforded equal weight, finding this "particularly true where, as here, an otherwise successful dealership intentionally disregards franchise require-

ments in violation of part (7) [of § 60-1433] and repeatedly demonstrates bad faith in its dealings with a franchisor in violation of part (8)." The court stated that "[o]therwise, a franchisor would either have to incur excessive audit costs or be at the mercy of a dishonest, yet successful, dealer." The district court reversed the Board's findings and order and granted Chrysler's application to terminate Janssen's franchise. Subsequent to the district court's ruling, Janssen timely perfected this appeal.

## ASSIGNMENT OF ERROR

Janssen asserts that the district court erred in reversing the findings and order of the Board and granting Chrysler's application to terminate Janssen's franchise.

## STANDARD OF REVIEW

In reviewing final administrative orders under the Administrative Procedure Act, the district court functions not as a trial court but as an intermediate court of appeals. *Chrysler Corp. v. Jim Earp Chrysler-Plymouth*, 8 Neb. App. 836, 602 N.W.2d 43 (1999). Proceedings for review of a final decision of an administrative agency shall be to the district court, which shall conduct the review without a jury de novo on the record of the agency. *Lackawanna Leather Co. v. Nebraska Dept. of Rev.*, 259 Neb. 100, 608 N.W.2d 177 (2000).

After an aggrieved party has appealed a district court's decision to the Court of Appeals, the Court of Appeals reviews the order of the district court, which may be reversed, vacated, or modified for errors appearing on the record. Neb. Rev. Stat. § 84-918 (Reissue 1999); *Chrysler Corp. v. Jim Earp Chrysler-Plymouth, supra*. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Chrysler Corp. v. Jim Earp Chrysler-Plymouth, supra*.

## DISCUSSION

*Good Cause to Terminate Franchise.*

Janssen argues that the district court erred in reversing the findings and order of the Board and granting Chrysler's applica-

tion to terminate Janssen's franchise pursuant to Neb. Rev. Stat. § 60-1420 (Reissue 1993). Section 60-1420 provides, in relevant part:

(1) Except as provided in subsection (2) of this section, no franchisor shall terminate or refuse to continue any franchise unless the franchisor has first established, in a hearing held pursuant to section 60-1425, that:

(a) The franchisor has good cause for termination or noncontinuance;

(b) Upon termination or noncontinuance, another franchise in the same line-make will become effective in the same community, without diminution of the franchisee's service formerly provided, or that the community cannot be reasonably expected to support such a dealership; and

(c) The franchisor is willing and able to comply with section 60-1430.02.

Section 60-1433 further provides:

In determining whether good cause has been established for terminating or not continuing a franchise, the board shall take into consideration the existing circumstances, including, but not limited to:

(1) Amount of business transacted by the franchisee;

(2) Investment necessarily made and obligations incurred by the franchisee in the performance of his part of the franchise;

(3) Permanency of the investment;

(4) Whether it is injurious to the public welfare for the business of the franchisee to be disrupted;

(5) Whether the franchisee has . . . service facilities, equipment, parts and qualified service personnel to reasonably provide consumer care for the . . . vehicles . . . sold at retail by the franchisee and any other . . . vehicle . . . of the same line-make;

(6) Whether the franchisee refuses to honor warranties of the franchisor to be performed by the franchisee if the franchisor reimburses the franchisee for such warranty work performed by the franchisee;

(7) Except as provided in section 60-1429, failure by the franchisee to substantially comply with those requirements

of the franchise which are determined by the board to be reasonable and material; and

(8) Except as provided in section 60-1429, bad faith by the franchisee in complying with those terms of the franchise which are determined by the board to be reasonable and material.

We agree with the district court that Janssen's evidence reflects favorably on Janssen with respect to the first six factors of § 60-1433. Accordingly, the determinative issues are (1) whether Janssen's conduct with respect to warranty and sales incentive claims constitutes either bad faith in complying with, or a failure to substantially comply with, reasonable and material requirements of the franchise and (2) whether an unfavorable showing with respect to § 60-1433(7) and (8) is sufficient to establish good cause, despite a favorable showing with respect to the first six statutory factors.

Janssen admits that the 1990 audit uncovered several instances where Janssen employees altered the mileage, date of service, or VIN data to bring the service or vehicle within warranty requirements. However, Janssen argues with respect to the warranty alterations that (1) Lee did not have personal knowledge that this was occurring and that when he found out at the time of the audit, he instructed his employees to stop; (2) the activity was not fraudulent because Janssen did not profit from it since the customer would pay for the repair if Chrysler did not; and (3) the work represented by the altered documents was valid because Chrysler would have approved the work if submitted as per the good will warranty procedure, as the customers in these cases called within the warranty period but did not, for whatever reason, have the vehicle serviced until a later time.

The evidence clearly shows that falsifying warranty documents is a violation of the dealership's various franchise agreements with Chrysler. Further, Lee's purported lack of knowledge regarding, and nonparticipation in making, the alterations is not material. Under the doctrine of respondeat superior, an employer is held vicariously liable for the negligent acts of an employee committed while the employee was acting within the scope of the employer's business. *Reeder v. State*, 254 Neb. 707,

578 N.W.2d 435 (1998). More specifically, the Nebraska Administrative Code provides:

> Manufacturers and distributors shall be responsible for the actions of their salesmen and representatives, and any violation of Chapter 60, Article 14, R.R.S., 1943, as amended, or of these rules and regulations, by a salesman or representative shall be deemed a violation by the respective employing dealer, manufacturer, or distributor.

253 Neb. Admin. Code, ch. 4, § 001 (1983).

We find Janssen's argument that it did not profit from charging warranty work likewise unpersuasive and irrelevant. The statutory good cause provisions do not contain any such exception for failure to comply with franchise requirements. The more relevant inquiry is whether Chrysler is harmed by a franchisee's failure to substantially comply with the terms of the reasonable and material terms of the agreement, such that the failure justifies termination.

Finally, while Janssen went to great lengths to argue that the warranty work was valid on the altered documents, we are not necessarily persuaded by Janssen's "customer letters." Chrysler required that mileage be reported at the time of the warranty service and not when the customer first noticed the problem. A procedure existed for Chrysler to approve out-of-warranty service, which Janssen did not follow in the instances for which it was charged back.

Janssen next asserts that termination of its franchise should not be based on the warranty document alterations, which occurred several years ago, essentially arguing that this is simply an old paperwork problem that has now been corrected in its operations. While there was a delay between the completion of the 1990 audit, the 1993 termination notice, and the filing of the action to terminate in 1996, there is evidence that there was ongoing litigation concerning the 1990 warranty charge backs, which resulted in an appeal decided by the Nebraska Supreme Court in 1995. See *Chrysler Corp. v. Lee Janssen Motor Co.*, 248 Neb. 281, 534 N.W.2d 568 (1995). Janssen has not argued that Chrysler should be barred by the doctrine of laches, nor do we find that Chrysler's delay in filing the action to terminate Janssen's franchise weakens its position for that reason. Further,

the warranty document alterations which Janssen claims have now been corrected were only part of the basis for Chrysler's decision to seek termination of the franchise.

Chrysler's second basis for termination of Janssen's franchise stems from evidence obtained during and relating to the sales incentive audits. With respect to the sales incentive audits conducted in 1982, 1991, and 1996, Janssen received sales incentive payments on several vehicles sold to Patricia, which vehicles were admitted to have been used in Janssen's Avis rental car operation. Janssen claimed the vehicles to be sales tax exempt as rental cars, listed the vehicles as rental vehicles on the corporate books for income tax purposes, but titled them in Patricia's name. Lee claims that the vehicles were primarily used for family purposes, and only occasionally used for rental purposes.

Janssen asserts that Chrysler's program rules are ambiguous; it interprets the exclusionary language in the sales incentive policy excluding sales to "daily rental companies" to mean vehicles used exclusively for daily rental purposes. Chrysler, in turn, argues that the rules are clear and that Janssen's sales to Patricia are excluded as not being true retail sales, as being sales to a daily rental customer (regardless of how often they are rented) and, in some instances, brokered sales.

Where the terms of a contract are clear, they are to be accorded their plain and ordinary meaning. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000). In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Id.* A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous. *Id.*

Janssen attempts to argue that an ambiguity exists with regard to the definition of "daily rental customer," because there is no definition of what percentage of rentals is required to render a

vehicle as one sold to a daily rental customer. We disagree that this position creates an ambiguity in the language of Chrysler's incentive rules. Regardless of whether the daily rental customer exception applies in a situation of a multipurpose vehicle, the sales to Patricia cannot be considered as both "sales to a retail customer" and "tax exempt sales to a lessor." Chrysler's rules clearly apply only to sales to retail customers. The vehicles sold to Patricia cannot be considered retail sales when the vehicles are paid for by Janssen, listed as corporate property, utilized several times a week in Janssen's Avis rental car operation, and treated as sales tax exempt leased vehicles. We find no error in the district court's finding that Patricia's vehicles are ineligible for Chrysler sales incentives.

Janssen further asserts that it should not be faulted for its practices in this regard, because Lee relied on what he was told; in other words, he never heard back from the State of Nebraska after Barkley's investigation, and he relied on advice of counsel. This argument is factually questionable in light of the repeated warnings, beginning as early as 1982, from Chrysler that Janssen's conduct with regard to claiming sales incentives on sales to Patricia and using the vehicles in its leasing operation were unacceptable under Chrysler's program rules. Due to the repeated warnings from Chrysler, and the caution from Barkley, we cannot say that Janssen was reasonable in believing its conduct was not a violation of the franchise agreements.

Our review of the record leads us to conclude that Janssen did fail to substantially comply, and exhibited bad faith in complying, with reasonable and material requirements of the Chrysler franchise.

We next examine whether this unfavorable finding under § 60-1433(7) and (8) is sufficient to establish good cause for termination. Chrysler argues that good cause under § 60-1433 has been found in situations much less compelling than those presented by Janssen's conduct in the present case. In *Rose Equip., Inc. v. Ford Motor Co.*, 248 Neb. 344, 535 N.W.2d 404 (1995), the Nebraska Supreme Court held that good cause to terminate a franchise existed in light of, among other things, the dealership's below-average sales, decreased parts purchases, nominal required investment, proximity to other franchises, failure to

maintain adequate parts inventory, refusal to do warranty work, and failure to comply with reasonable and material requirements of the franchise agreement with Ford. The dealership did, however, have adequate service facilities and qualified personnel. Similarly, in *American Motors Sales Corp. v. Perkins*, 198 Neb. 97, 251 N.W.2d 727 (1977), good cause for termination of a franchise existed where the dealership had failed to develop potential as a new car dealer.

Chrysler asserts that since the conduct of the dealers in *Rose Equip., Inc.* and *Perkins* were acts of omission, not involving dishonesty or obtaining money by false pretenses, then Janssen's conduct in affirmatively submitting incorrect warranty information, altering warranty documents, and repeatedly obtaining customer rebate money for sales that violated the Chrysler program rules should also constitute good cause to terminate a motor vehicle franchise. We find *Rose Equip., Inc.* and *Perkins* to be informative but not dispositive of the weight, if any, given to each of the individual good cause factors. In *Rose Equip., Inc.*, the Nebraska Supreme Court recited the evidence concerning most of the subsections of § 60-1433, and it appears that the majority of the statutory factors reflected unfavorably on the dealership, unlike in the present case, where the evidence concerning the first six factors is favorable to Janssen. In its order, the district court cited *Rose Equip., Inc.* for the proposition that the statutory factors are not afforded equal weight, but we do not believe the case stands for that proposition. In *Perkins*, while the court did not specifically address each subsection in discussing the evidence, it appears that the majority of the evidence dealt with the dealer's noncompliance with franchise requirements. It would appear that *Perkins* was an instance where good cause to terminate a franchise was found based on an unfavorable showing under just one of the statutory factors. However, we do not mean to suggest that the opinion stands for the proposition that an unfavorable showing on only one factor is sufficient to constitute good cause to terminate.

Chrysler directs us to *Craig Foster Ford v. Dept. of Transp.*, 562 N.W.2d 618 (Iowa 1997), wherein the Iowa Supreme Court affirmed a finding that the dealership's disreputable business practices justified Ford's termination of a franchise. Ford con-

ducted one audit, revealing 40 instances where the dealership reported sales within a customer rebate program period when the sales were actually made outside of the eligibility period. In 11 of the 40 incorrectly reported instances, the named buyers were employees of the dealership, not bona fide retail purchasers. In a number of the instances where cash rebates were involved, the dealer had issued universal bank drafts payable to the named "customer," endorsed the drafts in the payee's name, and deposited the drafts in the dealer's own bank account. Following that single audit, Ford commenced termination proceedings. At the agency hearing, the dealer, like Janssen, developed a strong showing and favorable record as to the first six factors of Iowa's good cause statute, Iowa Code § 322A.15 (1997), which are virtually identical to the first six factors of Nebraska's § 60-1433. The dealer admitted submitting falsified sales information to Ford in order to claim dealer and customer cash incentives, but claimed a Fifth Amendment privilege not to answer when asked whether he forged endorsements on rebate checks. Ford's case, like Chrysler's, focused on the audit results and the application of Iowa statutory factors (7) and (8), again virtually identical to factors (7) and (8) of Nebraska's § 60-1433. On appeal, the dealer argued that the department of transportation erred because it did not accord equal weight to all eight statutory factors. The Iowa Supreme Court disagreed, holding that the statute called for "qualitative rather than quantitative analysis." 562 N.W.2d at 623. The court went on to state:

> Rather than saying each factor shall be given equal weight, the section directs the agency to "take into consideration the existing circumstances, including, but not limited to" the enumerated guidelines. . . . Use of such flexible statutory criteria enables the law to address two different circumstances under which termination might be sought by a franchiser. A poor showing on factors (1) through (6) would signal financial and service weakness, problematic for the franchisor and public alike. Factors (7) and (8), by contrast, would reveal a breakdown in the parties' good-faith adherence to the terms of their franchise. Failure of performance on any one or more of the factors would be

detrimental to a sound business relationship operated in the public interest.

*Id.* The court concluded by stating that "[n]othing in section 322 A.15 suggests a legislative intent to reward profitability achieved by unscrupulous means." 562 N.W.2d at 623.

Chrysler also directs our attention to *Chesapeake Ford v. Motor Veh. Dealers Bd.*, 103 Ohio App. 3d 515, 660 N.E.2d 481 (1995), wherein the manufacturer sought termination of a franchise based on pervasive fraud perpetrated by the dealership in regard to warranty service. An audit conducted by the manufacturer revealed extensive billing for services not performed and for parts not utilized. In affirming the termination, the court held that the Ohio statute did not require express consideration of each of nine enumerated factors and that "pervasive fraud . . . can, in and of itself, constitute a sufficient basis for a determination that good cause to terminate the franchise exists." *Id.* at 521, 660 N.E.2d at 485. In other words, the "pervasive fraud" outweighed positive factors such as increased sales. The Ohio good cause statute, like that in Nebraska and Iowa, states that the agency should take into consideration a nonexclusive list of enumerated circumstances. See Ohio Rev. Code Ann. § 4517.55(A) (Anderson 1999).

█ We find the analysis in *Craig Foster Ford v. Dept. of Transp., supra,* to be persuasive. The nonexclusive factors of § 60-1433 call for a qualitative rather than a quantitative analysis. In the present case, despite Janssen's favorable evidence with regard to the first six factors, the evidence with regard to subsections (7) and (8) reveals a breakdown in the parties' good faith adherence to the terms of their franchise agreement, such that it would be unfair to require Chrysler to continue in its business relationship with Janssen. See *American Motors Sales Corp. v. Perkins*, 198 Neb. 97, 102, 251 N.W.2d 727, 729 (1977) (wherein nontermination would have frozen dealership "into a wholly unsatisfactory situation"). Accordingly, we find that based on its showing with regard to good cause under § 60-1433(7) and (8), Chrysler has met the requirements set forth in § 60-1420 for the termination of Janssen's franchise. We affirm the district court's judgment upon finding no error on the record and finding that the district court's decision conforms to

the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

## CONCLUSION

Chrysler has met the requirements set forth in § 60-1420 for termination of Janssen's franchise. Accordingly, we affirm the order of the district court.

AFFIRMED.