CITY OF LINCOLN, NEBRASKA, A MUNICIPAL CORPORATION, DOING BUSINESS AS LINCOLN ELECTRIC SYSTEM, AND MIDAMERICAN ENERGY COMPANY, APPELLEES, V. NEBRASKA PUBLIC POWER DISTRICT, APPELLANT.

636 N.W.2d 645

Filed December 18, 2001.   No. A-00-421.

William M. Lamson, Jr., and David J. Schmitt, of Lamson, Dugan & Murray, L.L.P., John R. McPhail, and Robert A. Green for appellant.

Thomas J. Culhane, of Erickson & Sederstrom, P.C., for appellee City of Lincoln, John E. Matthews, Brad Fagg, and C. Brian Meadors, of Morgan, Lewis & Bockius, L.L.P., for appellees City of Lincoln and MidAmerican Energy Company, and Jerrold L. Strasheim of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellee MidAmerican Energy Company.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

CARLSON, Judge.

## INTRODUCTION

Nebraska Public Power District (NPPD) appeals from an order of the district court for Lancaster County granting a declaratory judgment in favor of the City of Lincoln, doing business as Lincoln Electric System (LES), and MidAmerican Energy Company (MEC). For the reasons set forth below, we affirm.

## BACKGROUND

This case is an appeal from a declaratory judgment action involving the Cooper Nuclear Station (Cooper). NPPD owns and operates Cooper, an electric utility system providing for the generation, transmission, and distribution of electric power to customers in Nebraska and elsewhere. NPPD is a public corporation and political subdivision of the State of Nebraska. MEC is a public utility corporation organized under the laws of Iowa. MEC provides electrical service to customers and communities in Iowa, South Dakota, and Illinois. LES is a municipal corporation created by and organized under the laws of Nebraska. LES operates an electric generation and distribution system pursuant to its home rule charter and municipal code.

LES and MEC receive certain percentages of Cooper's electricity, 12.5 percent for LES and 50 percent for MEC. In exchange, LES and MEC pay corresponding percentages of Cooper's construction and operating costs.

In 1966, NPPD determined that it would need additional electric generating capacity to meet the needs of its customers. NPPD then determined that a nuclear power station with a capacity of approximately 800 megawatts would meet NPPD's needs and create additional power for future sale. Similarly, by 1966, MEC, then known as Iowa Power and Light Company, had determined that it could use additional energy to serve its own customers.

Thus, in the summer of 1966, NPPD and MEC agreed that Cooper would be constructed. In 1967, NPPD and MEC entered into a long-term power sales contract in which NPPD and MEC agreed that MEC would receive 50 percent of Cooper's electricity while paying 50 percent of the cost of Cooper's construction and operation. The evidence shows that NPPD and MEC desired to enter into a partnership, but were unable to do so. The record shows that this is because a partnership between NPPD and MEC would negatively affect Cooper's ability to obtain the necessary permits and approvals from the Nebraska Power Review Board. A partnership would also negatively impact Cooper's ability to issue tax-exempt revenue bonds. In addition, there was some concern about MEC's ability to own property under Nebraska law. Therefore, NPPD and MEC directed the attorneys

drawing up the contract to keep things as close as possible to a partnership concept, while making the contract legal.

The record shows that in 1968, NPPD entered into a similar power sales contract with LES. In that contract, NPPD agreed to sell LES approximately 12.5 percent of Cooper's electricity, with LES paying 12.5 percent of Cooper's costs of construction and operation. The history of the negotiations between LES and NPPD is not included in the record before us.

NPPD's power sales contract with LES ends on September 22, 2003, and NPPD's power sales contract with MEC terminates on September 21, 2004. Because the power sales contracts between NPPD and MEC, and NPPD and LES are essentially identical, we will hereinafter refer to the power sales contracts collectively as the contracts.

This case is centered around two sections of the parties' contracts, sections 13 and 15. Section 13 of the contracts requires NPPD to make available to LES and MEC "[a]ll operating and financial records and reports" relating to Cooper and states that "[t]he Purchaser's [LES and MEC] representative[s] shall at all reasonable times be given reasonable access to the Nuclear Facility and the records and reports" referred to above. Section 15 also requires that NPPD "confer with [LES and MEC] at all reasonable times when requested by [LES and MEC] and to give good faith consideration to [LES' and MEC's] reasonable recommendations in regard to operating practices of [NPPD] as related to [Cooper]."

From the beginning of Cooper's operation in 1974 until the mid-1990's, it appears that LES' and MEC's access to Cooper's operating and financial records and reports in addition to LES' and MEC's access to Cooper itself were not contested issues. The record shows that in the early to mid-1990's, issues began to arise under the contracts. In 1993, Cooper experienced an extended outage. Additionally, Cooper was shut down from May 1994 until February 1995 after the Nuclear Regulatory Commission found Cooper to be in violation of the commission's standards. As a result, LES and MEC began requesting more information about and greater access to Cooper. Additionally, LES and MEC filed suit against NPPD because of the financial costs to LES and MEC due to Cooper's shutdown.

In October 1998, NPPD issued a document entitled "PCM-01," its stated purpose being "to better assure that the Parties consistently observe the provisions of the Contracts." In section 6.0 of PCM-01, NPPD states:

> The District has often provided the Participants with information and access not required by the Contracts. . . . [W]hile the District will continue to provide the Participants with information and access as required by the Contracts, and may provide additional information or access, the District will not at any time be required to provide a Participant with information or access that is not required by the Contracts, even if similar information or access has been provided in the past.

Specifically, PCM-01 provides that from then on, NPPD would only provide LES and MEC with certain information through an NPPD employee with the title of project manager. Specifically, PCM-01 contains the following provisions:

> 6.1 <u>Information to be provided to MEC and LES.</u>
>
> 6.1.1 Participants will be advised that requests for information concerning CNS [Cooper] or the Contracts will be made in writing and sent to (or a copy provided to) the Project Manager. . . .
>
> . . . .
>
> 6.1.4 Information regarding District non-nuclear activities will not be provided under this procedure.
>
> 6.1.5 Information provided to the Participants will not include discussion of business proprietary, privileged or other confidential information of the District.
>
> 6.1.6 Information provided will not include draft information unless the District is requesting specific input or comment from the Participants on draft information.
>
> 6.1.7 The District will not analyze, manipulate, prepare data in specific reporting formats, or otherwise expend resources to present data in a manner other than that in which it is generally available for the specific use of the Participants.

Paragraph 6.2 of PCM-01, entitled "<u>Site Access,</u>" contains the following relevant provisions:

6.2.2 MEC and LES representatives will not be allowed unescorted access to the facilities described above. Reasonable access will be allowed upon written request, at a minimum of two days prior to the requested time, to the Project Manager.

6.2.3 The Project Manager, in providing access, will ensure an NPPD escort has been assigned to the Participant representative for the duration of the visit. Upon completion of site access, the escort will report to the Project Manager on the events of the Participant's visit.

6.2.4 The Participant representative shall not access, review, or copy any District reports or records without the approval of the Project Manager.

6.2.5 The Participant representative shall not remove any documentation from the site without the approval of the Project Manager.

Paragraph 6.3 of PCM-01 provides for conferences between the parties in the form of an advisory operating committee. In regard to this committee, PCM-O1 states:

6.3.1 The Project Manager will formally request MEC and LES to provide written suggestions for agenda items.

6.3.2 Information requests or suggested discussion items not considered suitable for the Advisory Operating Committee by the Project Manager will not be addressed at these meetings.

6.3.3 The Project Manager will produce an agenda at least one week in advance of the scheduled meeting. This agenda will include appropriate items suggested by the Participants, and other items that the Project Manager believes are timely and appropriate based on communications with the Participants or NPPD management, or otherwise.

6.3.4 The meetings will normally be held on a monthly basis at the District's General Office in Columbus, Nebraska.

Subsequently, both LES and MEC voiced objections to PCM-01 and asked NPPD not to implement it. When NPPD refused, LES and MEC brought the instant suit, contending that the contracts unambiguously require NPPD to afford them the sort of access to Cooper and to Cooper's records that they had been afforded prior to NPPD's imposition of PCM-01 in 1998. NPPD

counterclaimed, alleging that PCM–01 is not a breach of the parties' contract, but, rather, that PCM-01 affords LES and MEC greater access to Cooper and its documents than the contracts require. LES and MEC moved for summary judgment, which the trial court denied. Trial was held February 28 through March 2, 2000.

Terry Bundy, administrator and chief executive officer of LES, testified regarding the information flow between NPPD and LES in the period prior to 1990. Bundy testified that prior to 1990, LES was getting some level of periodic reports. Bundy testified that because Cooper was operating well in LES' view, LES did not think a lot of day-to-day oversight was required. Additionally, Bundy testified that LES was well aware that MEC had an increased involvement in Cooper because MEC paid a much greater percentage of NPPD's costs. Bundy testified that LES drew some comfort in this fact. Bundy also testified that prior to 1990, no one from LES exercised the right to unescorted access to Cooper, although MEC representatives routinely did so. Bundy testified that LES felt that if it was necessary, it could get unescorted access to Cooper at a later point in time.

Bundy testified that after 1990, problems at Cooper developed, including extended power outages. Bundy testified that in addition, LES was receiving information indicating that the Nuclear Regulatory Commission had some concerns regarding Cooper's operation. Bundy testified that LES felt it necessary to increase its involvement and get additional access to information at that time. Bundy testified that in 1994, he met with Ronald Watkins, president and chief executive officer of NPPD at that time, and asked for additional information. Bundy testified that Watkins provided him with additional information regarding Cooper. Additionally, Bundy testified that Watkins offered to provide an office for LES at Cooper. Bundy testified that LES accepted Watkins' offer and chose an LES representative, Ron Stoddard, to staff the office. Bundy testified that Stoddard eventually became "badged" for access to Cooper, allowing Stoddard unescorted access to Cooper. The record shows that to become badged, a person must pass certain tests in addition to a background check. The record also shows that Stoddard and other badged persons do not have unrestricted access to Cooper.

Rather, a person badged for Cooper has unescorted access to Cooper subject to certain safety and security precautions set out by Cooper and the Nuclear Regulatory Commission.

Bundy testified that over the next few years, NPPD and LES' relationship was satisfactory, but that the situation changed upon LES' receipt of PCM-01 in October 1998. Bundy testified that LES did not have an opportunity to provide any input regarding PCM-01 in advance of its receipt of PCM-01. Bundy testified that LES was very concerned about PCM-01 and that he wrote a letter to NPPD indicating that he considered PCM-01 to be a breach of the parties' contract.

Bundy testified that NPPD then went on to implement PCM-01 and that LES then filed a lawsuit because LES felt that it was being denied access to Cooper and to Cooper's records. Bundy testified that after NPPD issued PCM-01, NPPD took away Stoddard's badge and indicated that he needed to vacate the office he was using.

Two former MEC employees testified at trial regarding MEC's access to information and to Cooper both prior to and after NPPD's implementation of PCM-01. Richard Singer testified that he was a consultant with MEC for 15 years from 1984 to 1999. Singer testified that he worked closely with the Cooper plant during this time. Singer testified that from 1985 on, the atmosphere at Cooper was extremely open and that he could ask for just about any document and that NPPD would provide it. Singer testified that NPPD provided MEC with both preliminary and projected information regarding Cooper. Singer testified that he first became badged in 1987 and was allowed unescorted access to Cooper at that time. Singer testified that he did not visit Cooper on a daily basis or attend daily meetings because he felt that he could get the information he needed by calling Cooper employees. Singer testified that at certain times, he would visit Cooper frequently, especially if Cooper was experiencing a power outage.

William Turnbull also testified on MEC's behalf. Turnbull, an engineer, testified that he became employed with MEC in April 1994 and that subsequently, his attention became almost entirely devoted to Cooper. Turnbull testified that in late 1994, he became badged and received unescorted access to Cooper. Turnbull testified that he then made trips to Cooper, attended meetings on site,

and called people at Cooper for information. Turnbull testified that from 1994 to 1998, he had access to any Cooper documents he wanted and in all forms.

Turnbull testified that after PCM-01 was adopted, information flow from NPPD to MEC was restricted. Specifically, Turnbull testified that PCM-01's requirement that MEC's requests for information be in writing was extremely time consuming. Turnbull testified that prior to PCM-01, he could have gained access to the same information by sitting in on a meeting or by calling a Cooper employee. Turnbull testified that since NPPD's adoption of PCM-01, NPPD had denied MEC access to documents that MEC had previously received and prohibited MEC representatives from attending meetings MEC representatives had previously attended. Turnbull also testified that although NPPD continued to provide MEC with certain information, NPPD now did so on a delayed basis.

LES and MEC also called several witnesses who had worked in the nuclear industry to define the phrases "reasonable access" at "all reasonable times" and "all operating and financial records and reports." All of MEC's witnesses defined these terms very broadly. Regarding "reasonable access" at "all reasonable times," these witnesses testified that in the nuclear industry, this commonly means unescorted access to a nuclear facility 24 hours a day, 7 days a week, without notice to the facility.

Regarding "all operating and financial records and reports," each witness gave a slightly different opinion, but agreed that although LES and MEC are not entitled to all documents relating to Cooper, the phrase "all operating and financial records and reports" should be construed very broadly. For example, one of these witnesses defined an operating record as any record that is required to run or manage a business and stated that financial records are a subset of operating records, encompassing everything relative to accounting and tax. This witness also testified that record includes recorded information of any kind regardless of media and format, in addition to draft information and future projections. Each witness called by LES and MEC testified that PCM-01 is inconsistent with the parties' contracts because it severely restricts the access to Cooper and Cooper's documents that LES and MEC are entitled to under the contracts.

NPPD also called several witnesses at trial. Guy Horn, senior vice president of energy supply for NPPD since 1997 and an NPPD employee since 1961, testified that from 1986 through 1990 he had little contact with LES or MEC representatives. Horn testified that from 1990 to 1993, he had some interaction with MEC representatives and began to give MEC monthly packets of information. Horn testified that from 1990 through 1993, representatives of LES and MEC attended some meetings at Cooper, but very infrequently. Horn testified that during this same time period, LES and MEC representatives were not at Cooper on a daily or a weekly basis. Horn testified that in 1994, both LES and MEC became more interested in activities at Cooper, and that the meetings NPPD had with LES and MEC increased with an extended power outage at Cooper which occurred from May 1994 until February 1995.

Horn testified that subsequent to the above outage, LES and MEC filed lawsuits against NPPD and that LES' and MEC's requests for information became more intrusive at this time. Horn stated that NPPD implemented PCM-01 because of NPPD's concern over the purpose of LES' and MEC's needs for more information. Horn also testified that NPPD was experiencing difficulty in managing its contract relationship with LES and MEC. Horn testified that upon implementation of PCM-01, he pulled the badges from those LES and MEC representatives who had them. Horn testified that while NPPD will allow LES and MEC to attend some meetings at Cooper on a periodic basis, NPPD will not allow LES and MEC to attend these meetings on a routine basis. Horn testified that it is his belief that under the contract, LES and MEC do not have a right to attend any meetings at Cooper with the exception of the advisory operating committee monthly meetings.

On cross-examination, Horn testified that the requirement under PCM-01 that LES and MEC give NPPD 2 days' advance notice before visiting Cooper would not be reasonable in all circumstances. Horn also stated that if a document is considered a record under the parties' contracts, NPPD cannot deny LES and MEC access to this document by claiming that it is confidential or that it might be used for litigation. Horn also stated that it would be appropriate for LES and MEC to file a lawsuit if they

believed they had a need to do so. Horn testified that it is not improper for LES and MEC to seek information that they might later use in a lawsuit against NPPD.

NPPD also produced evidence through its accounting manager, Traci Bender. Bender testified that NPPD was converting to a new accounting system at the time of trial. Bender testified that this change had adversely affected the flow of financial information between the parties somewhat, but that NPPD's implementation of PCM-01 produced very little change in the flow of financial information between the parties.

Alan Dostal, the project manager or NPPD contact person under PCM-01, testified regarding the information NPPD supplies to LES and MEC. Dostal testified that NPPD supplies a wealth of information to LES and MEC. Dostal testified that this information includes a daily report and a telephone number regarding the status of Cooper's operation. Dostal testified that after NPPD adopted PCM-01, LES and MEC representatives were no longer entitled to attend certain meetings that they had previously attended. In addition, Dostal testified that after PCM-01, NPPD had offered LES and MEC certain information on the condition that it not be used in litigation.

NPPD also called its own experts to testify as to the meaning of the phrase "all operating and financial records and reports." One of these experts, Donald Skupsky, a records retention expert, testified that operating records in the nuclear industry would involve those records related to the actual operation of the plant and the production of the electricity, including logs that are developed in that process. Skupsky testified that his definition of operating records does not include drafts or works in progress.

Skupsky defined financial records as those records that document expenses and revenues. Skupsky testified that under his definitions of financial and operating records, the following categories of records would not be included: human resources, general administration, public relations, planning, and insurance policies. Skupsky testified that the phrase "operating and financial records and reports" is certainly not synonymous with all documents, but, rather, incorporates only a percentage of a company's documents.

In an order filed April 3, 2000, the district court ruled in LES and MEC's favor. The trial court declared sections 6.1.1, 6.1.2, 6.1.4, 6.1.5, 6.1.6, 6.1.7, and 6.2 of PCM-01 void as a breach of the parties' contracts. The court stated that PCM-01 curtailed both the access to Cooper and the access to information regarding Cooper that LES and MEC historically enjoyed. Regarding LES' and MEC's "reasonable access" to Cooper at "all reasonable times," the trial court stated that it is not unreasonable for LES and MEC to designate representatives under the contracts who qualify for badging. The trial court stated that once these representatives are badged, they should be entitled to unescorted access to Cooper. The trial court stated that in the event that LES or MEC select a representative who does not qualify for badging, NPPD may require that a nonbadged person be escorted at all times when present at Cooper.

Regarding LES' and MEC's access to all of Cooper's "operating and financial records and reports," the trial court noted that it was the intention of the parties that their contracts be as close to a partnership agreement as they could be without being a partnership.

The court specifically stated:

> Placed in the context of a partnership agreement philosophy, there is no evidence that at the time the contract was entered into, any party contemplated that "all operating and financial records and reports" meant anything other than every piece of information which a business partner might find useful in making the most effective and efficient use of the financial investment that partner had in the venture. In the context of the issues now before this court, that translates into a sharing of operating and financial information to the extent necessary to allow each partner to be as profitable as a result of the relationship created by these agreements.

The trial court also stated that NPPD has a duty under section 15 of the contracts to confer with LES and MEC at all reasonable times when requested by LES or MEC. The court stated that it is a breach of the contracts for NPPD to direct any of its employees to refrain from conferring with LES or MEC as requested by LES or MEC. NPPD appeals.

## ASSIGNMENTS OF ERROR

NPPD argues, condensed and restated, that the trial court erred in (1) failing to properly apply rules of contract interpretation; (2) determining that PCM-01 fails to provide LES and MEC with reasonable access to Cooper and its records and reports at all reasonable times; (3) rendering a decision that is vague, overbroad, and ambiguous and incapable of adherence by NPPD; and (4) finding that LES and MEC sustained their burden of proof for a declaratory judgment.

## STANDARD OF REVIEW

A suit for declaratory judgment is an action sui generis and may involve questions of law or equity or both; whether a declaratory judgment action is treated as an action at law or one in equity is to be determined by the nature of the dispute. *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994). When the essence of the dispute sounds in contract, the action is to be treated as one at law. *Id.*

The construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000).

Determinations of factual issues in a declaratory judgment action will not be disturbed on appeal unless they are clearly wrong. *Miller v. City of Omaha*, 260 Neb. 507, 618 N.W.2d 628 (2000).

## ANALYSIS

*Contract Interpretation.*

On appeal, NPPD argues that the trial court erred, as a matter of law, in failing to properly apply rules of contract interpretation. Specifically, NPPD argues that the trial court erred in finding the parties' contracts to be unambiguous. Additionally, NPPD contends that the trial court improperly reviewed the parties' conduct under the contracts prior to NPPD's imposition of PCM-01 in 1998.

In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Chrysler Corp. v. Lee Janssen Motor Co.*, 9 Neb. App. 721, 619 N.W.2d 78

(2000). A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Id.*

A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Ruble v. Reich, supra.*

In the instant case, we are concerned with the phrases "all operating and financial records and reports" and "reasonable access" at "all reasonable times" as used in section 13 of the contracts. NPPD argues that the trial court erred in finding these phrases to be unambiguous. We agree with NPPD and determine as a matter of law that these phrases are ambiguous because they can be fairly interpreted in more than one way.

If a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract. *Id.* Determinations of factual issues in a declaratory judgment action will not be disturbed on appeal unless they are clearly wrong. *Miller v. City of Omaha, supra.* Therefore, we review the extrinsic evidence in this record to determine the meaning of the contracts, keeping in mind that we cannot overturn the trial court's factual findings unless they are clearly wrong.

In its order, the trial court reviewed the extrinsic evidence and determined that the parties' course of conduct prior to NPPD's imposition of PCM-01 in 1998 was of great importance in determining the meaning of the contracts. We agree with the trial court's determination.

The interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence. *Stephens v. Radium Petroleum Co.*, 250 Neb. 560, 550 N.W.2d 39 (1996); *Solar Motors v. First Nat. Bank of Chadron*, 249 Neb. 758, 545 N.W.2d 714 (1996).

On appeal, NPPD contends that the trial court erred in failing to properly review course of conduct evidence in determining the parties' true intent under the contracts. NPPD argues that the evidence regarding the parties' prior course of conduct shows that prior to NPPD's imposition of PCM-01 in 1998, NPPD provided LES and MEC with limited access to Cooper and related information. Therefore, NPPD contends that the parties' true intent under the contracts was that LES and MEC receive only limited access rights to Cooper and its information. NPPD argues that the access rights accorded to LES and MEC by the trial court are dramatically more expansive than the parties intended.

In its order, the trial court made several factual findings regarding the parties' prior course of conduct under the contracts. The trial court found that from 1967 until 1994, the relationships between LES, MEC, and NPPD were typically problem free. The court found that prior to 1990, Cooper was operating smoothly, at minimal cost to all parties. The court stated that prior to NPPD's imposition of PCM-01, MEC routinely had a badged representative with unrestricted access to Cooper. The trial court noted that from time to time, MEC representatives visited Cooper and that "[t]he times, dates, and duration of these visits were determined by the MEC representative." The trial court stated that in addition, prior to 1994, NPPD was responsive to all of MEC's requests and inquiries.

In regard to LES' involvement with NPPD prior to 1994, the trial court stated that "LES did not routinely have a representative in contact with NPPD personnel or present at the Cooper facility during the period from 1974 through the early 1990s." The trial court stated that instead, LES' contact regarding the Cooper facility was generally by communicating with the MEC representative. The court also noted that during that time period, LES' view was that MEC was protecting LES' interest because of their similar contractual positions.

The trial court stated that during the early 1990's, Cooper experienced a number of problems. In 1993, the court stated that Cooper was shut down for an extended refueling outage. In 1994, the court noted that the Nuclear Regulatory Commission found Cooper to be in violation of commission standards and that Cooper was shut down from May 25, 1994, until February

1995 to correct these problems. The trial court stated that as LES and MEC became aware of Cooper's problems, LES and MEC each requested and received from NPPD greater access to Cooper, its documents, and Cooper personnel. Additionally, an LES representative became badged for Cooper, and NPPD gave LES an office at Cooper. The court stated that disputes arose between the parties over the shutdown from May 1994 until February 1995 and that LES and MEC filed suit against NPPD because of the financial costs to the parties of Cooper's shutdown. The trial court found that NPPD's reaction to this litigation was to adopt and implement PCM-01 in October 1998.

In essence, the trial court found that prior to PCM-01, LES and MEC requested and were granted a great deal of access to Cooper and its records and reports. Although NPPD provided some contrary evidence at trial, we cannot say that the trial court's factual findings regarding the parties' course of conduct were clearly wrong. Based on its findings regarding the prior course of conduct between the parties, the trial court found that it was the intent of the parties under the contracts to allow LES and MEC very liberal access to Cooper and its documents. Given the record before us, we cannot say that the trial court erred in its conclusion.

*PCM-01 Violation of Contracts.*

On appeal, NPPD argues that the trial court erred in determining that PCM-01 fails to provide LES and MEC with reasonable access to Cooper and its financial and operating records and reports at all reasonable times. In its order, the trial court found that NPPD's adoption of PCM-01 violated the contracts because PCM-01 restricted the access to information and to Cooper that LES and MEC had historically enjoyed.

NPPD argues that PCM-01 did not significantly change the amount of access LES and MEC had previously received to Cooper and information regarding Cooper. Although NPPD produced some evidence to this effect at trial, LES and MEC produced a large amount of evidence to the contrary. Specifically, LES and MEC showed that after NPPD's adoption and implementation of PCM-01, NPPD removed the badges from all of the LES and MEC representatives who had them. Under PCM-01, LES and MEC must now request permission to visit Cooper 2

days in advance, and an NPPD employee must be with them at all times. NPPD also asked LES to vacate its office at Cooper. Regarding meetings at Cooper, LES and MEC showed at trial that subsequent to PCM-01, NPPD denied them access to a variety of meetings, stating simply that it "does not plan to have" LES or MEC attend.

LES and MEC also showed, and the trial court held, that PCM-01 significantly restricted the flow of information from NPPD to LES and MEC. We agree. The record shows that on a number of occasions, NPPD refused LES' and MEC's requests for certain operating and financial records and reports relating to Cooper. Specifically, the trial court noted that after PCM-01's implementation and adoption, NPPD denied LES and MEC access to certain documents, including draft information, plan-of-the-day documents, minutes of management meetings, agenda for site senior manager's meetings, and documents associated with change control board activities. Additionally, in regard to several other documents, the record shows that NPPD provided these documents to LES and MEC, but did so on a delayed basis.

Given the record before us, we conclude that the trial court did not err in determining that NPPD's adoption and imposition of PCM-01 constituted a violation of the parties' contracts. The trial court correctly determined that PCM-01 fails to provide LES and MEC reasonable access at all reasonable times to Cooper and Cooper's records and reports.

*Impossibility of Adherence.*

NPPD contends that the trial court's decision is vague, over-broad, and ambiguous, resulting in an impossibility of adherence by NPPD.

Specifically, NPPD states:

> For example, the trial court found the parties intended MEC and LES receive "every piece of information which a business partner might find useful . . . [.]" On the other hand, the trial court also found "the contracts limit the information NPPD is required to make available to the plaintiffs. Plaintiffs are not entitled to every scrap of paper or electronic file defendant possesses."

Brief for appellant at 34.

Clearly, NPPD's argument pertains to that portion of the trial court's order regarding which documents NPPD is required to grant LES and MEC access to. Besides stating that LES and MEC are entitled to receive every piece of information which a business partner might find useful, the trial court stated that for the duration of the contracts, NPPD must make certain types of documents available to LES and MEC. Specifically, the trial court stated that NPPD is required to make available to LES and MEC for inspection and copying "any information possessed by NPPD or under its control, stored on any medium, including, without limitation, plans, projections, estimates, expectations, or possible needs, which reflect, refer to or bear on" nine different categories of information that LES and MEC are entitled to, including information regarding outages or shutdowns at Cooper, whether NPPD has properly allocated expenses authorized by the contracts and costs of production of energy at Cooper, and whether NPPD has properly distributed the power generated by Cooper.

NPPD argues that the trial court erred in listing out categories of documents that NPPD must grant LES and MEC access to. Instead, NPPD contends that the trial court was required to pinpoint the exact documents NPPD is required to give LES and MEC.

NPPD states:

> For example, the court ordered NPPD make available all such information as to "[w]hether NPPD is complying with its duty to operate and maintain and make renewals and replacements to the Cooper Nuclear Facility and the EHV facilities in an efficient and economical manner, consistent with good business and utility operating practices." . . . However, those documents are not identified, nor as noted herein, were they even offered in evidence to enable the trial court to specifically find whether they are operating or financial records and reports and thereby provide a basis for NPPD to comply with the order.

Brief for appellant at 34-35.

Clearly, the trial court was not required to set out each and every document that is included within each of the nine categories. Nor would it have been possible for the trial court to do

so, since the documents NPPD generates may well change over time. Similarly, it would have been impossible for LES and MEC to enter into evidence each and every document that the parties have exchanged or may exchange in the future.

After reviewing the record, we conclude that the trial court's order which sets forth nine categories of information that NPPD must provide to LES and MEC is capable of adherence by NPPD. We also conclude that that portion of the trial court's order granting LES and MEC access to information about Cooper is neither vague, overbroad, nor ambiguous. Thus, NPPD's argument is without merit.

*Burden of Proof and Lack of Jurisdiction.*

NPPD argues that the trial court lacked jurisdiction to enter its order because LES and MEC failed to sustain their burden of proof for a declaratory judgment. Specifically, NPPD states:

> MEC and LES failed to offer in evidence documents in dispute between the parties as to whether they constitute operating and financial records and reports, and also failed to offer any evidence regarding access to information and facilities within the context of the subject contracts. The trial court therefore lacked jurisdiction as it rendered an advisory opinion only, and MEC and LES have failed to sustain their burden of proof.

Brief for appellant at 37.

We do not agree with NPPD's contention. The record before us consists of 954 pages of testimony and 5 large volumes of exhibits, each volume consisting of several hundred pages. The record before us contains over 100 exhibits. Our review of the evidence reveals that LES and MEC offered into evidence numerous examples of documents constituting operating and financial reports. Similarly, a review of the evidence produced at trial shows that LES and MEC offered a substantial amount of evidence regarding their access to information regarding Cooper and to Cooper itself. Given that evidence, we conclude that the evidence produced by LES and MEC was more than sufficient and that LES and MEC met their burden of proof for a declaratory judgment.

## CONCLUSION

After reviewing the record, we conclude that the trial court properly applied rules of contract interpretation to determine that PCM-01 violates the parties' contracts in that PCM-01 fails to provide LES and MEC with reasonable access to Cooper and its financial and operating records and reports at all reasonable times. Additionally, the trial court's decision is not vague, overbroad, or ambiguous, nor did LES and MEC fail to sustain their burden of proof for a declaratory judgment. Therefore, we affirm the trial court's order granting LES and MEC's petition for a declaratory judgment.

AFFIRMED.